173407 Todd Graham et al. v. Richard Fearon et al. Arguments not to exceed 15 minutes per side. Mr. Bondaroff for the appellants. Good morning, Your Honors. May it please the Court, my name is Samuel Bondaroff. I am here on behalf of current and former employees of the Eaton Corporation who invested in the Eaton Savings Plan and specifically in the Eaton Company Stock Fund during a period from November of 2013 through the end of July in 2014. And specifically, our case is about what happens when fiduciaries of an employee stock option plan or an ESOP are aware that the employee stock is trading at an artificially inflated price. The question then becomes, what if anything should they as fiduciaries do about it? The guidance primarily comes from the Supreme Court's 2014 decision, Fifth Third Bancorp v. Dudenhofer, which basically says that whatever action you propose they take or should have taken has to meet two criteria. It has to be consistent with the federal securities laws, and it has to be one that a reasonable fiduciary in the same circumstances would not believe is more likely to harm than help the plan and plan participants. I've looked at every circuit court post-Dudenhofer and haven't seen one that's found that latter point. Have you found one? One court that has ruled in favor of a plaintiff making these claims? No. Absolutely not, Your Honor. Not a single circuit court. And since the Amgen decision in 2016, not a single district court. Well, you got the Ninth Circuit to rule in your favor for a little while, and then the Supreme Court flipped it. That is correct, Your Honor. The Ninth Circuit in the Harris v. Amgen case ruled, I think correctly, that we're talking about efficient markets and efficiently traded stock. So if you are bound by the federal securities laws to make a corrective disclosure, how could it be that as a fiduciary you could believe that making a corrective disclosure that would merely eliminate the artificial inflation of the stock price would somehow be more harmful to those you're supposed to be looking after than helpful? I don't know, but I understand your point. At the same time, it seems like every court, including the one below here, say basically that that's a judgment call that they get to make, and as long as they make a reasonable call, we're not going to interfere. Your Honor is correctly summarizing what most of those courts have said, and I would submit that for two reasons we should be very careful about listening to that reasoning. One, it doesn't actually make sense if you look at what Dudenhofer says. What a lot of courts have done since Dudenhofer and Amgen is extrapolated from the language of the more harm than good standard and said that it stands for more than it really does. What it says is that a district court should consider whether a reasonable fiduciary might believe that disclosing negative information to the public might cause greater harm than help. Okay, it's perfectly fair to consider that. It uses the phrase negative public information. You have to come up with a solution, right? That's what they say. Yes. The plaintiffs have to say, well, this is what they should have done, and this is feasible, right? Yes, Your Honor. What is the solution? Well, the solution is, I guess, twofold. One is that I think as this court ruled in the Sommer case, if I'm pronouncing that correctly, and what other courts have ruled in the Reinhardt case in the Second Circuit, you can't just simply put forward a case for generic securities fraud and then slap an ERISA label on it and say that, therefore, the more harm than good test will always be passed if there's the same case as a securities fraud case. You have to go a little further than that. You have to have some facts that are specific to the actual case you're looking at, which we believe we have here. We have, first of all, we have not just the issue of the stock price correction because of the fraud, but we have the concern that a fiduciary should have had that the longer the fraud went on, not only might the stock price correction be harsher, but that the stock price recovery could be slower, and that's another harm that nobody's talked about in any of these decisions, but it's a real harm that a fiduciary ought to consider. By the time you filed suit, the stock price was back where it was, or maybe even above where it was when they initially made this disclosure. Yes, the stock price did eventually recover several years later, but in the many ensuing months after the disclosure, after the end of the class period, the stock price not only didn't recover, it dropped further. I mean, they ultimately make the disclosure here, right? They say, look, we're going to consider spinoffs, and then they say whatever they say. There's a tax consequence, so we're not going to do it, right? Yes. And so, I mean, I guess when I look at the three things you've said they should have done, issued corrective disclosures, halted new contributions, and directed the fund to divert a portion of its holding into a low-cost hedging product, it seems like what you're spending most of your time on is point one. Are you essentially, it seemed to me point two is really, I mean, that's a hard one, and you seemed almost conceited. Are you still trying to pursue it, or are you conceding it's foreclosed on the facts by Amgen and Salmer? I would say, Your Honor, that I tend actually to agree that the second option is not the best one. The concern that is articulated in Dudenhofer and some of the other cases is that if you make a corrective disclosure, prematurely you'll spook the market, and there could be an overcorrection. So what's your best argument why we should go contrary basically to every other circuit? Well, one, I would encourage you to read Dudenhofer itself. I think a lot of the circuits and district courts. What language? I've got it here. It looks pretty bad for you. Well, I would say, first of all, Dudenhofer is primarily concerned with arguing why fiduciaries of ESOPs are not entitled to a defendant-friendly pleading presumption. It's actually going out of its way. Most of the decision is concerned with saying they should be subject to the same duty of prudence as every other ERISA fiduciary. The only exception to that is that they don't have to diversify, but otherwise their duty of prudence is the same as everybody else's. Since then, the law of these other circuits, especially the Fifth Circuit and Whitley, has been to say, well, any stock price drop that a reasonable fiduciary might fear from corrective disclosure is enough to foreclose the case. If that's true, then there's no way to plead a duty of prudence case against an ESOP fiduciary, which means we are back to the munch presumption, only it's even worse. It's essentially saying these fiduciaries are immunized. Let me ask you this. Let me read you this language and then ask you how you have satisfied this, not how you hypothetically could, but how you have. Third, lower courts, and I'm reading from the end of Dudenhofer, faced with such claims should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases, which the market might take as a sign that insider fiduciaries viewed the employee stock as a bad investment, or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund. Well, to focus on the corrective disclosure part of that, a prudent fiduciary in this case would have looked and said, well, the stock is artificially inflated by fraud. It is not negative public information we're talking about. We're talking about known to be artificially inflated. It seems to me, and correct me if I'm wrong because I do struggle with this, it seems to me that what this says is this presumes the fraud and says making the disclosure, or presumes the error, whatever you want to call it, making the disclosure would do more harm than good to the fund by causing a drop in the stock price. And we can look at what happened here. When they made the disclosure, there was the biggest stock drop in the stock price, $6 or something, 14 to 20%. The stock drop in the stock price, right, that occurred. So why couldn't they in their judgment say making this disclosure is going to cause a problem, it's going to cause a drop in the stock price, and it's not worth it at this time? The logical extension of that is to say that they never need to act on fraud. Essentially because whenever you correct a fraud in stock price, the stock price will drop. That's the nature of artificial inflation. They did correct it here, right? It's not Enron. They went out and said, look, we've got a problem. Boom, we can't do this. The stock dropped. If they had done it earlier, fewer people would have bought at the inflated price. That's less harm to plan participants. We contend the stock price drop would not have been an issue. That's always true. So the day you make the mistake, you're subject to suit under your analysis because the next day, if you don't disclose, you've caused someone to buy at an inflated price. If you correct the mistake early on, you're not going to have the reputational harm penalty for prolonging the fraud. But where does it say that in this case? This is what I'm struggling with and all the circuits are struggling with. What they said is that you have to show a prudent fiduciary would have made a contrary decision. What you're saying is look at all these good reasons they should do it. Your Honor, two things before I have to sum up. One is no court has been able to come up with what, if the way you just articulated it is correct, if that's the way we have to read this, no judge has been able to articulate a situation where you could plausibly allege this claim. And there's nothing in Dudenhofer that says they wanted to end these claims. And two, we've been down this path before. We spent 20 years assuming that there was this defendant-friendly presumption in the law and that ESOP fiduciaries were essentially immune from liability until the Supreme Court had to come out and correct all of the circuits in the country. And I think it would be important for us not to go down that path again. We have to follow what the Supreme Court says whether we agree with it or not, right? Absolutely. We should. I would suggest that this would be following the Supreme Court and not the other circuits. Good morning, Your Honors. May it please the Court. My name is Roman Martinez. I represent the defendants in this case. Your Honor, the core issue in this case, as members of the Court have recognized, has been looked at very carefully by the Supreme Court multiple times now. It's been looked at by this Court in Somer. It's been looked at by the Second and the Fifth Circuits. It's been looked at by at least 14 district courts across the country. And the plaintiffs have never won in that. Isn't your opposing counsel's point a valid one, which is the Supreme Court didn't mean to foreclose these claims altogether? I think that's right, Your Honor. I think the Supreme Court didn't mean to foreclose these claims and the test they articulated doesn't foreclose them. Tell me how, post-Dudenhofer, a plaintiff could plausibly state a claim here. What would they have had to have done differently in this case to state a claim? I want to answer that question. Let me just preface it by saying that I think there are some tricky questions, no doubt, about exactly what Dudenhofer means and how to interpret it and how to apply it. And I think in a harder case, you may need to draw fine lines. I don't think this is the case in which you need to. Why not? Because this case is actually an easy one under any conception of Dudenhofer based on the facts. I think, first of all, with respect to the pleadings that were made in this complaint, everything that they have said, everything that they have pointed to, would actually require every fraud claim to survive a motion to dismiss because the theories that they put forth about every— Your guys were saying basically, look, we can spin these companies off and we can spin them off, and they claim that that artificially inflated the price. Don't they claim that? I don't think they claim that, Your Honor. With respect, I think if you look at what the district court said at pages three to four of its opinion, they say actually the opposite, that Eaton executives repeatedly made clear that they were not going to do a spin-off. Now, I think what plaintiffs do claim, and I don't want to be unfair to the allegations in their complaint, what they do claim is that my clients were misleading about whether the spin-off could be done with or without adverse tax consequences. And what the district court in this case recognized, and if you look at the Southern District of New York that addressed literally the exact same allegations, what they said was that essentially that the tax consequences of a spin-off are immaterial, and they're immaterial precisely because the executives in this case made clear over and over again that the spin-off wasn't going to take place. So just to step back, their fraud allegation is that the Eaton executives failed to disclose the hypothetical tax consequences of a hypothetical spin-off that Eaton executives unambiguously said over and over again they weren't considering wasn't going to happen. And so I think in this particular case, a reasonable fiduciary. Counsel, didn't they do more? I mean, they didn't just say, oh, we're not going to spin-off, we're not going to spin-off. They actually said, no, there's nothing in the structure of the deal that would affect that. I think what they said, Your Honor, is that there's nothing in the structure of the deal that would preclude or forbid a spin-off. I don't think they ever said, in fact, the record does not show that they ever said that there would be zero tax consequences of a spin-off. But I think what's also – You're right. They said there's nothing in the deal per se that would prevent us from taking portfolio moves. Right. But we have no such plan. Right. And again, this is getting into the weeds of the facts a little bit. But I just want to be very clear. I think the Southern District of New York and the district court here, what they concluded was that in light of the repeated statements that the spin-off was just not going to happen, wasn't in the cards, wasn't under contemplation, they essentially said that the hypothetical tax consequences of that hypothetical spin-off really don't make a difference. And so if you put yourself in the shoes of the reasonable fiduciary in those circumstances who's aware of the same disclaimers of the intent to do a spin-off at all, I think a fiduciary could say, hey, we've made clear that we're not going to do a spin-off. So even if there were some confusion or some doubt as to the tax consequences of this hypothetical spin-off, it wouldn't matter. Then why did the stock price drop? I'm sorry, Judge White, did I interrupt you? I was just asking what about the – so that was the initial responses. But then what about, oh, there's no sacred cows and we're always willing to sell or acquire? I think they were making the statement as a general matter that, you know, certainly the leaders of the company were always – they weren't inflexibly opposed to considering opportunities that arose in general. I don't think that that sacred cow comment should be interpreted as some sort of signal that with respect to the vehicle division, which is the one that's at issue here, that they were sort of contemplating that. But I think, Your Honor, I want to focus on the strength of the allegations of the fraud. I think that's just one factor about this case. I think the second – How does the fraud here that they are claiming that you did? The allegation, it's really a far-fetched theory, Your Honor. It's this idea that we're misleading about the hypothetical tax consequences of this hypothetical spinoff transaction involving the vehicle division, even though it's unambiguous, undisputed, and perfectly clear from the record that the Eaton executives repeatedly said they weren't going to do the transaction. They weren't considering the spinoff transaction at all, at which point why does it matter what the hypothetical tax consequences would be? I think this relates to the second reason why this case is a particularly straightforward one and not one in which you need to face hard issues about Dudenhofer, and that's that the nature of the fraud here is one that, unlike some other frauds, it just wasn't going to come to light on its own. Some frauds are going to come out one way or the other either way, and so the question is, well, is it better to sort of get the information out there early ourselves or let it come out naturally? The nature of this particular fraud is such that the claim is about the tax consequences of a spinoff, but everyone agrees, I think on both sides, that this spinoff was not going to happen in reality, and so if Eaton had just waited out the period until 2017, if no spinoff had occurred... What's the significance of the drop in stock price then when they announced this? Well, I think the drop in stock price, you know, they announced this in July 2014. It was, I believe, at the end of a call that talked about a number of things, including negative financial performance. And so, you know, there were a whole bunch of things going on with the stock price. I mean, certainly... Your position is it wasn't just attributed to this statement that there would be tax consequences. I think it's very hard to know exactly what was driving it, but certainly there were other negative things that were part of that call, and certainly, you know, as I think the Court adverted to earlier, the stock price has fully rebounded. So I think when you look at the allegations in this case, you know, they're the same kind of generic and conclusory allegations that have been rejected in cases over and over again. I mean, this is not a circuit that has not addressed this issue. This is the Sommer circuit, you know, just a few months ago. In Sommer, this Court addressed a case that raised essentially the same allegations, the same factual scenario. Judge White, did you have a question? No. Oh, okay. Sorry, counsel. Let me say a word about Sommer, Your Honor. The exact same allegations were made there. You know, there was the insiders allegedly knew that the stock price was overvalued. The plaintiffs alleged that they should have disclosed information, and the Court rejected that. You know what Sommer said. Can you go back to my question? How could a plaintiff make this claim? Like where is it post-Dudenhofer? Because your opponent is right. We can agree that the Supreme Court did not mean to foreclose these claims in total. I think the kind of case that would survive is a case unlike this one, where the fraud is both severe and is known with certainty that there is, in fact, a fraud. I think where the information is going to inevitably come out, unlike this case, where it wouldn't have necessarily come out. And third, where the timing of the- But that would be a really hard case to plead and know about, right? I mean, that is essentially Enron. Well, I think what Judge Caproni said in her decision in one of the 28-J letters that we submitted, she gave an example that was sort of an Enron hypothetical, but I don't think it's necessarily the case. You know, for example, imagine you had a car company where the CEO of the car company announces, you know, 30 days from today we're releasing a new truck, it's the best truck ever, it's really safe. And the insider fiduciary knows that, in fact, the testing has shown that the car is not safe and that one in ten fender benders is going to lead to an explosion. The insider fiduciary at that point knows that once that car hits the market, you know, cars are going to start blowing up across the country. It's inevitably going to be discovered that what the CEO said was wrong. This is not that case because here, again, everyone agrees that the spinoff transaction wasn't going to happen, so no one would have ever found out, no one would have ever learned what the tax consequences of that spinoff were. And so even if there was in some sense a fraud or some misleading statement about the tax consequences of a spinoff, that was not something that was going to come to light. So I think that would be the kind of scenario. I think the other factor, though, that's important to consider here is the makeup of the fund and the composition of the fund. That's a very important factor that should bear on how courts analyze these complaints. You know, here the allegation is made that the fund contained about $909 million worth of investments and that during the class period $40 million of additional money was put in. I think a reasonable fiduciary looking at those facts would realize that if the stock took a hit as a result of the disclosure, the $909 million would shrink a lot. They allege ultimately about a 20 percent, we think this is not correct, but a 20 percent drop in the stock price. So if you think that the disclosure would have led to a 20 percent drop, that means $182 million of value would have evaporated immediately, directly as a result of the fiduciary's action. And according to Plaintiffs, the purpose of that is to protect the new investors, the $40 million coming in. So, you know, we're going to light on fire $182 million of existing value in order to protect against $8 million of losses. I think a reasonable fiduciary could certainly look at that and say, you know, that tradeoff doesn't make sense at all. And I think that's the kind of common sense insight that was underlying this court's decision in Sommer and the Supreme Court's decision in Dudenhofer that, you know, in the ordinary circumstance, the fiduciary is supposed to protect the beneficiaries and the plan participants. And you don't usually do that by taking deliberate actions that you know are targeted to making him lose money. I mean, and so I think the Supreme Court recognized this is going to be a very unusual claim, and that's why I think it's entirely appropriate and entirely fair that these claims have been hard to plead. And I think that makes a lot of sense. You know, we think that the complaint in this case was properly dismissed. We also think that the district court properly did not grant leave to amend. You know, that request was not made in the way. They didn't submit an amended complaint. They did not submit an amended complaint. At that point, not then, not now. They didn't say what was going to be in it. They didn't say what it was going to be. This court's precedents are 100% clear. PR Diamonds, Begala, the Badun case we just submitted, and I apologize for the late submission a couple nights ago. We think that it's absolutely clear. This claim was properly dismissed. The district court did not abuse its discretion, which is the standard in denying leave to amend, and so we ask the court to affirm. Thank you, counsel. Let me just make a few brief points in rebuttal. First, let's talk about whether there's fraud here or not. We've alleged that there was a known fraud. Now, the appellees are arguing that the fraud wasn't known, it was suspected, or there was no fraud at all. They're basing that on the decision from outside the circuit, which was subject to a very different pleading standard, and which, frankly, we think is wrong on the facts. What is the known fraud? The known fraud is them saying repeatedly to the public, we can do a spinoff anytime we want without consequences. We're choosing not to. We're not going to do a spinoff at this time. But just so you know, we could if we wanted to, and it would be fine. We're not going to, but we could. But we're not going to. That ambiguity was something the market definitely took seriously. Analysts noted it. Companies make ambiguous statements all the time about what they might and might not do, and those clearly aren't covered. I mean, Dudenhofer's made that clear. Well, Your Honor, look, if we believe that under the pleading standard of Rule 8 that ERISA is subject to and that these claims are subject to, those inferences should be read in our favor, and it does rise to the level of an adequately pleaded fraud. I will say that the Dudenhofer analysis does, to a large extent, turn on whether you believe there was a fraud pleaded or not. If you decide that the stock was not known to be fraudulently inflated by the fiduciaries, then they're right. You don't have to disclose that information. That's exactly the kind of situation that Dudenhofer contemplates where you might spook the market and overcorrect. But if you do, as Iqbal and Twombly suggest that you should, read the inferences in our favor, and you don't subject them to the higher pleading standard of the PSLRA, and you don't find that Sienta wasn't adequately alleged here, then... It's got to be a plausible inference from the facts. It does, and we believe we've pleaded that plausible inference. I would also note that the Southern District case that dismissed them did give them leave to amend, and that to the extent this court feels that we didn't adequately plead the fraud, we would ask for leave to amend. I mean, your opposing counsel is right. Our circuit precedent is pretty clear. To get leave to amend, you have to submit or at least tell the court. The courts aren't in the business of giving advisory opinions. The judge here gave a pretty thorough opinion. It's not meant to be advisory, and if you're not going to submit what you're going to file, you're never going to get leave to amend. I understand that, Judge. I would want to say one more thing with the remaining time I have, which is that what we've talked about is reputational damage here, the reputational penalty cannot be pleaded in any case. That is unique to this case and some other cases. As the court pointed out, the stock price eventually did recover. The stock price could have recovered right away. That happens sometimes when frauds are disclosed, and in that case, one can argue that, well, you can see that they're not penalizing the company for having delayed in coming forth with the truth. They're happy that they came forth with it when they did, and so there's not going to be a long-term penalty. But that long-term fraud is that they just said, well, we may have a spinoff, period. And we can have a spinoff without any consequences. If there is a reputational penalty, it doesn't just affect the buyers. It's false to say that this is about the holders versus the buyers, because the holders get hurt by that penalty, too. They get a harsher correction than they otherwise would have dealt with. They have no guarantee that the stock price will eventually recover. They may have to get out of their 401K before it does. What about the holder who can't wait for the stock price to recover three years from now, who needs that money right away? They're left out in the cold. For these reasons, Your Honor, we think you should reverse the opinion of the lower court. Thank you, counsel. The clerk can call the next case.